I'm David Naderdepe. I'm here on behalf of the Arizona Health Care Cost Containment System Defendants, or ACCESS as that acronym is pronounced. This panel heard Ball once, so I'm not going to go into any further detail about how the case first came to you, other than to note that the panel judges now have a much longer history with the case than counsel appearing before you. I hope that's a good thing. Suffice it to say that the case has a long history dating, at least evidence-wise, into the last century. When it was before you as Ball 1, the arguments were based on a record that had been made at least largely with respect to the Medicaid Equal Access Statute, and a claim based on that statute that was then apparently viable.   and a claim based on that statute that was then apparently viable. There are two appeals before us, as I understand. And the second one is from a motion to ñ was your motion to dissolve the injunction or to modify the injunction? What was your motion? Your Honor, as I understand what transpired, there was a question in the minds of the parties and the Court as to whether the injunction that had been entered was to expire as of June 30th of 2009. The Court entered an order, and an appeal came from that order. The parties were still litigating the finality of that issue. Ultimately, the Court made a determination, as I understand it, that the injunction was to be considered a final ñ or a permanent injunction, rather, and then there was an appeal tailing off of that order. But you also made a motion to vacate or modify the injunction. And this relates to your observation about the state of the record. I mean, the record was made when it was made. Presumably, if you wanted the judge to look at the current record ñ current circumstances, because they changed in some way that would have justified modifying or vacating the injunction, you would have come in and tried to demonstrate that. You did, in fact, file something called a motion to vacate or modify the injunction. But now you're telling us that it doesn't raise any different issues and you haven't given us an excerpt of record on ñ or any record on it. Your Honor, my understanding is that the issues that are before the Court and those that were remanded from Ball One relate to the applicability of the statute to a record that was made in 1999 through late 2001. I understand that. But you could have made a record as part ñ you should have made a record with regard to your cross-motion to vacate or modify an injunction about the current circumstances. But as I understand it, you don't want us to look at that record, if there is one. I don't know if there is one, but you haven't submitted excerpts and you haven't submitted an argument. Your Honor, the arguments relate to the entry of the order by Judge Carroll in 2001. Okay. So you can't tell us that there's a problem with a record being an old record because you could have made a new record, but you didn't. I'm not saying that we're seeing a problem with the record. I think we have the old record and that's what we're arguing about. Oh, I'm sorry. Then why were you telling us that it was a record made in 1999 to 2000? Because the events that gave rise to the record were in the testimony of the plaintiffs and the defendant's witnesses were with respect. But the injunction is a good injunction if it was valid then, because nobody has been trying to update the record. I think that's correct. Okay. In any event, Your Honors, Ball One was decided at a time after Sanchez v. Johnson that held that the equal access theory was no longer going to be viable. And so it came before the court the first time in Ball One with an understanding that that was not going to be viable. The court reversed and it remanded with what I read to be fairly explicit directions to the district court. The first thing was to decide if the Medicaid free choice provision applied in this case in light of the way that Arizona had secured a waiver from the federal government to operate its access program. And if so, then whether the defendants had violated those free choice provisions. And also the ADA. And the second issue, as I see that it was directed back, was to assess whether the defendants had violated the Rehabilitation Act or the Americans with Disabilities Act. And I'll refer to them as the ADA because they're construed that way. What I think the court contemplated was that there would be a further development of a record toward findings and conclusions about the impact of those statutes on this dispute. But there was no particular redevelopment of the record. And it was apparently to the satisfaction of the plaintiffs because the parties filed cross motions for summary judgment on the record as it then existed. Well, then the judge is hardly to be faulted if both parties are telling him that the record's okay. I'm sorry? I said the judge is hardly to be faulted then if both parties are telling him the record's adequate. I don't know if we're faulting the court for examining the record that it had in front of it as limited. We're faulting the court with the conclusions that it drew from the record as it was presented to it. There was no trial initially, was there? I'm sorry? Was there a trial originally or was it summary judgment? There was a three or four-day trial in 2003. So there was a trial. So he could have made findings on the old record with respect to the new theories. That's what happened. Okay. Seemingly that's what happened. Okay. The defendants believe that the court really didn't make, however, this assessment that I described of the applicability of the free choice and the ADA theories to the dispute. In essence, it substituted free choice and ADA in its legal conclusion as a statutory support for its earlier order that had been based on its displeasure with the operational shortfalls that it had used to find this equal access violation. And the defendants believe that that is the error here. Now, if one thing is clear from the record, it is that the lower court had displeasure with the operational shortfalls that some of the plaintiffs had suffered. In his 2004 findings and conclusions, even while acknowledging that progress was being made by the defendant, Judge Carroll stated that his intent was to do whatever was available to prevent similar experiences. We believe that the question that's before the court today is whether free choice or the ADA were really available to support that intent. Now, the defendants argue that if the free choice or the defendants argue that the free choice and the ADA provisions are really not tools that were at the court's disposal to impose the level of operational control that it imposed in this case. As a brief aside, it's not. It's not all that onerous, is it? I'm sorry? I said what is the level of operational control? It doesn't seem all that onerous. It's a fairly hands-off injunction, isn't it? The injunction requires the parties to file monthly reports as to imperfections in service to renegotiate their contract. Well, you'd think you'd be collecting that information anyway. And what else? And renegotiating their policies and their contracts with the providers that provide the services. Presumably sometime in the last 10 years you've done anyway. What else? And then to further monitor the activities. That doesn't sound like anything that an ordinary agency wouldn't be doing. None of it. And probably it may be doing some of these things. The question is whether the legal theories that the plaintiffs propound and are left in this case support the idea that a court can mandate that as opposed to the agency undertaking some step that it may need to take otherwise to monitor. At which point you go back to the judge and say modify the injunctions because we have to do this. It just doesn't seem like you're really – I mean there are so many cases in which there are so-called institutional injunctions that are really in some sense – I can understand why an agency would find it onerous even if necessary. But this one I'm not really understanding why you're finding it this hard. Your Honor, I've been in this case for about six weeks. The rationale behind 10 years of litigation I'm not sure I can tell you. Well, let me be more specific. What would you – we have a wonderful mediation office. They can really help people to settle much harder problems than this one. What would you think of if in the end, you know, after hearing everything you have to say, we were to withdraw a submission, not submit the case and send you all off to at least see whether you think with the help of one of our mediators it is worth at least engaging in some serious mediation to see if we can resolve this very, very long but not really fairly narrow dispute? Your Honor, I do not have authority to bind the agency with respect to that kind of an approach. My personal sense is that any time you can mediate disputes rather than litigate disputes, that's not a bad idea. So you would take this thought back to the agency if we decide that's what should happen? Oh, clearly I would take that back. In any event, it would be permissive. It would simply be, you know, to explore with the mediators whether to enter into mediation. I mean, that's all it would be. I'm sorry, whether to? It would simply be to explore with the mediators whether to enter into mediation. It wouldn't be an order to do it. Now, of these things that you're required to do, you've been filing the monthly reports, and I don't think it's been terribly onerous, and I'm sure it's very good practice for the agency. To know whether they're having any problems. Obviously, the beginning of this lawsuit, because there were very serious problems, just, you know, very onerous things that happened to people, and pretty awful things that happened to people in their homes, left for hours and hours in compromised situations. So it seems to me that the state really wants to do everything that's in these injunctions, but it's just maybe they don't want to have the burden of telling us about it. Well, Your Honor, I've worked with health plans over the years, and over the years there has been more and more and more compliance obligations on the health plan, and less and less availability for health plans. I'm not talking about access now, because it's strictured by the federal government's approach to it, but I will say the more strictures there are on how to operate a system, the less flexibility there is for a plan to be innovative, to try new things, to implement new things. And not all of them are going to be successful. Even the cases under the ADA that are in the brief that talk about implementing the ADA don't talk about perfection, and you can't talk about perfection in a system like health care that's imperfect. Well, no, but you do. It seems that this injunction asks you to tell accurately what the agency is doing, what problems it's encountered, and that's something that I'm sure your agency should be doing for itself. It's just that it's being required to tell the federal government also. Well, and there's been, I guess, it's not a record, but there have been problems with the plaintiffs objecting to the form of the submissions subsequent to all of this as well. But basically you have some reporting requirements. You have requirements with regard to having backup workers. You have a complaint system. You know, all of those you'd think you'd have anyway. What else? Well, Your Honor, I guess the question would be whether these statutes mandate that kind of micromanagement of the system. I mean, that's the essence of the problem. Let's take the ADA, for example. Under Olmstead and what's his, Townsend, is that our case? Townsend is one of the names of the cases. And some other cases from various circuits, like the one about the five prescriptions here and the three prescriptions there. It doesn't seem a fair surmise that if the state will make non-segregated care, i.e., care in the community available only if you're willing to accept care that will have, you know, because it doesn't provide. It's like providing for segregated schools where you'd have a black school that goes from nine to four every day and an integrated school, but you can only go to school until noon. Presumably that's a discriminatory segregated system, and I assume that this one would be too. Why not? Your Honor, the cases that have found violations of the ADA have found, I think, more systemic, more What's wrong with that theory as a discrimination theory? That it's discriminatory to say that if you want to accept integrated care, I'm using that word for community care, you have to accept care that's not actually going to cover your needs. Well, I guess I will go back to what Olmstead and Townsend suggest, and that is that it's not perfection that we're seeking here. There has to be latitude for the agencies to implement the state program. All right, but that's not a theory problem. That's a problem about whether this record would substantiate that theory. But first I'm asking you on the theory level. Would that theory be correct? On a theory level, if the circumstances are so onerous that this class is forced out of home care into institutions, that would be a violation. So ultimately your problem isn't with the theory, it's with the record and whether we would have to re-mention it to have a more complete record, given the fact that the original theory I mean, your initial complaint, which may have some validity, is that he should have re-looked at the record or perhaps had an additional hearing, given the fact that his original primary theory wasn't viable anymore. Certainly, Your Honor, in light of the improvement that this agency showed of record, the cases do not intimate that the ADA is going to require perfection everywhere. You mean of record before the record closed in 2001? Right. I mean, the record suggests that there was improvement being made in connection with these services, in connection with waiting lists, in connection with all of those things. But that leads at most to a remand to do appropriate fact-finding for this theory. It doesn't lead to saying that the injunction is no good, that we just don't have facts or fact-finding on it at this point. Well, again, Your Honor, at the bottom line, I mean, the position of the agency is that the injunction is overbroad for whatever kind of violation is going to be found here, if any. And obviously, the position of the agency. Are you intending to reserve some time? Do I have a couple minutes? Yes, you do. Let me reserve a couple minutes. Three and a half. Thank you very much. No. Good morning, Your Honors.  My name is Ken Zeller with AARP Foundation Litigation. With me at counsel table today is J.J. Rico from the Arizona Center for Disability Law. And we represent the plaintiffs in this case. And I've been on the case for a total of 18 months, so I guess I'm not the newest on the block. He seems to shed people. Didn't shed us, though. The court is obviously interested in the state of the injunction and the ruling on it and whether or not it was overbroad. And I'd like to address that for just a moment, if I could. Well, let me first state that all of the issues are before the court. The remand was for findings of fact on the freedom of choice, as well as the ADA and Favreau IV. But in both instances, I mean, this is the problem. In both instances, you need to know what exactly it is that would violate one or the other, since the main thrust earlier was on a theory that now is not viable under 1983. It's not nonviable in the world at large. It just is nonviable under 1983. Right. And so the problem is that Judge Carroll did not go back through either the legal or factual material to explain what it is that would violate the ADA and then to make findings that are attached to that theory. And if, for example, the theory was one like the one that I articulated, then it would seem that perhaps some comparison between the degree of care available in institutions and outside of institutions would be necessary, and we don't really have that. Your Honor, I'm not so sure that it's necessary to know what the degree of care is outside and inside the institution as a question of quality. The question is basically one of sufficiency. I understand that. And if we knew that in the institution there were also times when, I mean, you'd have to demonstrate that in the institution there were also gaps in service. There weren't gaps in service, but outside there are. Right. And our case, though, is one that is based upon persons in the community who are at risk of institutionalization rather than those who are. But they don't have an ADA theory, do they? If they would get about the same level of coverage in the institution as they're getting out of the institution. They clearly would, Your Honor. If their preference is for community care as opposed to institutional care and they're placed at risk of institutionalization by the actions or inaction of the state in administering its programs, then they are in violation of the integration mandate of the ADA, which is the my hypothetical before, which is obviously an extreme one. If the – it wouldn't matter whether the integrated school was poorer than the segregated school. If they want the integrated school, they should be able to have it? No, Your Honor. I thought your analogy was pretty apt. The analogy we've used is you have the choice of two restaurants to go to and you can go to either one and at one you'll get a beautiful full five-course meal exquisitely served and at the other one you'll get a sandwich and – Exactly. So don't you have to prove that there is one in which you'll get a beautiful five-course meal? We – again, it's – maybe I'm not articulating it, but it's more the fact that there is care available, the critical services are there and being addressed, and not so much that – to torture this analogy a little bit more – not so much that the caregivers come in in white tie and tails and bringing silver and linen tablecloths. As long as they're there, it becomes a real option, a feasible alternative. And going back to our freedom of choice argument, then it becomes one that is a real choice that individuals can make then. Do I want the institutional choice or do I want the community choice? When the critical services – On the freedom of – I assume you're going to argue a little about the freedom of choice issues, but it does seem like an awful lot to hang on that statute, that there is a substantive part of what kind of choice you have to make, as opposed to the notion that at least the state has to provide what it says it's going to provide. I mean, if the state says this is a feasible alternative for you because they do the care plan and we're going to provide X and informs you of that and tells you to choose it and then in fact doesn't provide X because the people don't show up and you're left in your bed, then it seems to me that perhaps they violated the statute because they didn't provide the choice that they said they were providing you. But your argument is a little more than that. It is, Your Honor. The case did not plead any part of the Medicaid statute that might avail us of that theory. We were discussing quality of care specifically. So your theory isn't more than that? Did I just describe your theory then, the freedom of choice theory? It is. The freedom of choice theory is that the state must offer this choice between community and institutional care to an individual. But what if it provided, what if the care plan said that we're going to, or what we're going to offer you is 20 hours a week of attendant care, little footnote, except that, you know, if somebody doesn't show up, it's your problem. Now, where would you get the notion that the statute, the freedom of choice statute, as opposed to the Medicaid statute as a whole and the pieces that you can't quite get after 1983 requires more than that? The problem is you're taking one piece out of the statute because it happens to be amenable to 1983, and I'm not sure you're not putting too much on it. Yes. I think, again, I'm coming back to, you know, the choice offered to an individual. The plan of care comes after the choice has been made, of course. And as you described, if the plan of care is insufficient or doesn't meet with the individual's needs as they view them, then their choice is frustrated, and they have certain avenues of appeal. They have administrative processes. They have complaints that they can take up through the vendors of the services and approach it that way. We're trying to make sure that at the basic level, that when persons are making their individual choices, that it's a real choice and not an empty choice or an insufficient choice. Just before I forget, do you have a view as to the mediation question? I mean, as I said to your colleague, it doesn't seem that you're all that far apart, really. I mean, you wanted some tweaking of the injunction, and they want some tweaking of the injunction. The injunction is not that onerous. It doesn't get you that much either. So the question is, what if we – and the main objection seems to be to having a court ordered – the court looking over their shoulder, and maybe there's some way to mediate this and get something acceptable to both sides and solve the problem. My hesitancy about mediation, Your Honor, is that there's nothing that's been demonstrated to us over the past six or seven or eight years that there was any willingness to budge or to engage in a good-faith style. But as I say, I mean, all this would be would be to explore it and see whether it's worth going forward with. Settlement has been explored on more than one occasion, and there are a number of issues, quite frankly, mostly related to the attorney's fees that have been clicking. The clock has been ticking on attorney's fees since the year 2000. Again, I agree with you. We're not that far apart on the issues. I think the injunction is absolutely very narrowly tailored to the problems that it's supposed to address. It's very non-interventionist. It's mostly a record-keeping sort of thing. But it also requires there to be something real. And it was only until March of this year that the ñ well, in the March 8th order, Judge Carroll found that the defendants still hadn't instituted a hotline, nor had they required the providers to have backup workers present and ready to go. So we're in 2010, and we're still working on this. But they also showed, if they're accurate, that I think there was something like 500 average gaps out of a couple million. That was the number of gaps that were in the record and proven. And we have some serious concerns with the gap reports that the state files in their method of analysis, and we tried to introduce some proof and introduce the report of Dory Seavey, who had done some analysis of the state gap reports. But now both of you are telling us you don't want us to adjudicate, essentially that we shouldn't look at that record and we shouldn't really worry about the modification or vacating parts of that order. I mean, you have an order. You've apparently introduced some evidence. They introduced some evidence. Nobody wanted to brief it, and nobody's sent us any excerpts, and we're supposed to decide the case. How can that be? It's a different case, isn't it? The other case, which deals with the modification motions, and presumably with their record and your record as to that, nobody has briefed us, and they didn't want you. That's correct, Your Honor. The excerpt of record are not there on that. That second appeal, as it were, came up very late in the case, and obviously everyone was focused on the ‑‑ So what do you want us to do with it? You want us to ‑‑ I mean, I'm supposed to dismiss it on the ground that nobody ‑‑ that it isn't the same case as what was represented to us. It's quite a different case, and nobody briefed it, and nobody gave us excerpts, and you lose. You both lose. That would be fine with me. In fact, you lose, too. Everybody loses. But then we don't look at that record. If you're going to dismiss the second appeal on the injunction issue, that would be fine with me. We'd like to ‑‑ Then your representations about what the record shows at that point are sort of irrelevant. As to the ‑‑ As to the fact that they haven't been complying or they ‑‑ Oh, correct. Or whatever. Correct, Your Honor. But, again, our major concern here, obviously, is that the court's findings of fact regarding the Americans with Disabilities Act and the free choice requirements is upheld. Don't you think he was a little cavalier in fulfilling the remand request? He heard four days of testimony, Your Honor. Ten years ago. Excuse me? But on a different theory. I mean, both of these were completely the tail wagging the dog. The theories were pled. You know, the ADA and 504 were pled. Freedom of choice were pled. It was before the court. He heard four days of pretty wrenching testimony regarding people left in Hoyer lifts. But these statutes are all different and they all have different ‑‑ You first of all have to know what they mean and then you have to know what the statute, what the record shows about what each statute means. And we don't have that. But they support, I think the facts support all of the issues before the court. The risk of institutionalization theories under the ADA and 504 are very clear. I mean, the integration mandate says what it does, that services are to be provided in the most integrated setting. And in this case, the critical services were frequently, in Judge Carroll's mind, frequently not provided such that they raise the risk of institutionalization. And also I might say that ‑‑ The record on that is relatively sparse, isn't it? The record is what it is, Your Honor. It's the trial, basically the trial, the four‑day trial that the court heard. Do you think that the district court judge could have made more adequate findings based on the evidence that was presented? Again, Your Honor, I think he made enough. You know, I'm the plaintiff's attorney. I would always want more. Obviously, the more detailed, the better. And the more support for the decision, the better. But the point is I think the court had plenty of facts on which to base. And unless there's clear error ‑‑ Well, what are the facts with regard to the notion that, in fact, there was a danger of reinstitutionalizing these people because of the gaps? There was one woman who went into the institution for 10 days. Peg Ball, Your Honor. And what else is there? I'm sorry? What else is there? Peg Ball, who ‑‑ I know, I just heard that. There was evidence from five other ‑‑ four other named plaintiffs, one of them, Ms. Spinks, who had much the same kind of comments about the services. In one instance, they had to flag down help on the street in order to get her to help her Asian mother turn her over in the bed because the care hadn't showed up. She was the one that was left in the Hoyer lift, if you know what a Hoyer lift is. And she was left in a Hoyer lift overnight, sleeping in the same position all night. And the attendant problems with pressure, sores, and that sort of thing. She can't move her legs and can't move her arms but can use her hands a little bit. And she's having significant gaps in services. It's that kind of information that he heard, and that's in the record, the excerpts of record at, I believe it's 216 at SEC, is the testimony of those individuals. Clearly enough to show risk of incident. May I ask a question? Yes, sir. That incident that you described, was any investigation done whether this was just one person not showing up or because the group that was supposed to provide the service basically had not had adequate help, they didn't have adequate hotline or something to get help? Because I think that relates a little bit to the legal theory here. I mean, it seems to be to me a little strange that nobody seemed to want to add to the factual record, including the state. But here, I mean, isn't that the heart of the dispute? Whether this happened to be one unfortunate incident or is it because the things weren't being done by the state to assure that the services were provided on an ongoing basis? Your Honor, I believe it's, in some ways, the resolution of the particular incident and what happened after the fact is less relevant to these issues. It's certainly relevant to the individual and should have called for an investigation. I don't know whether it did or not, and I don't believe the record talks to that. The fact that it happened and that it happened more than once and on a number of occasions, perhaps not with the same level of impact on the individual, but nevertheless happened on more than one occasion is the issue that we're pushing here today because when you get enough of that, then you're putting the person at risk. Well, this, of course, is the problem of what the district court did here. I mean, it would be interesting to know whether this is five incidents out of 100,000 people being served or in which case an argument can be made, the injunction is unwarranted or overbroad, or is it because of defects? Now, before you alerted, you mentioned they hadn't installed the hotline, which seems to me a real defect in what's going on and how many complaints were made. You know, and because of the lack of the hotline. I agree, Your Honor. Plaintiffs were in court on more than one occasion complaining of the lack of the hotline. But this explains to me. I mean, I gather at that, in the most recent round of that, they said that they were giving people a 24-hour number to call. So what's the difference between that and the hotline?  I'm sure there is one because you said... Yes, there is. I don't know what it is. There clearly is. The system in Arizona is the Medicaid agency is so far from the people that it makes for, I think, problems in communications and knowing exactly what's going on. You have access, and I know I'm going over things that are addressed in our brief, but you have access, which is the Medicaid agency, and then you have the second agency that administers the long-term care program who contracts with private contractors who provide the service. It's a capitated managed care system, and there are these several levels that you go through until you get to the care person, the person who's giving the care. Yes, they gave, or the testimony was that they gave a telephone number that's available 24 hours a day, but the number that you called was perhaps to a case manager who may or may not be there, and in the testimony that's in the record, they... Well, then it's not available 24 hours a day. So it's not. No, absolutely not. So your problem isn't that a 24-hour, 7-phone call to several different people instead of one person would be a problem, it's that they weren't really there. Is that also a good question? Exactly. And you may be getting a recording, you may be getting a lab individual, and it's a case manager, not someone who can do something about it immediately. The idea behind the hotline was to get the information directly to someone who could take some action. Okay. You've used up your time. Thank you very much. Thank you. Thank you, Your Honor. Thank you. May it please the Court. I'll be very brief, Your Honor. The record, I think, reflects that there were 30 people out of 7,000 receiving the home at community-based services that identified issues with these gaps. Well, how would you prove a case like this? Okay. I'm sorry. How would you prove a case like this? I mean, there were 30 people who did what, who didn't get services? Who had gaps in services. It doesn't demonstrate. You mean 30 specific people? I mean, I thought that the record shows that there's gaps, various gaps at various times for various people. There were 30 people who seemed to have some serious problem, or at least who came forward as to specific problems. At the trial, I think I have not gone through these. But how would you try a case like this in general? Well, if you have a class action, you have a systemic problem, which I assume you can demonstrate, i.e., that there are gaps in the service. And then you have people testify as to the impact of the gaps in the service on them. And you can't have everybody come forward and demonstrate specifically the gap. You have one person come in and say, well, I have this problem, and so I couldn't get out of bed. Another one comes in and says, well, I have this problem, so I couldn't go to the bathroom. And you're going to make everybody do that before you'll assume that a gap in the service for somebody who really needs these services is going to have a negative impact on them? What I'll say is that the cases, the district court cases that get to the free choice and the cases that get to the ADA violation involve, in some of the cases, hundreds of people on waiting lists for years and years and years. I'm saying to the extent there is a line to be drawn here, Judge Carroll drew that line, approximating perfection. Other courts have drawn that line for a very long time. Now, but I'm not understanding one thing. Is your problem that there were only 30 people who had gaps, as the statistics showed, or only 30 people as to whom there was direct evidence of how the gaps affected them? Because our health care system is imperfect, I would have to concede that there are more than 30 people who had difficulty with the system across the State of Arizona. Exactly. But not thousands, as the other cases hold, not waiting lists of years and years. Well, it's not a waiting list case for the most part. It's a case about gaps in services. Well, would you concede that there should be a hotline? Your Honor, I think what the State implemented as a result of this litigation was a line where the individual could call the care agency, which is, as counsel described, a contractee of the ACCESS system. I think in recent times they have put together a statewide hotline that is personed by someone at ACCESS, and there has been very little, I'm told, response to that statewide hotline because people want to go to the care provider to get the answers that they're going to need and can't practically implement. Well, they need somebody to come right now and do something. I think that's what the hotline. So I can understand that you don't want to get someone to answer the phone who says, well, we deal here with policy interpretation. The individual wants help. Your Honor, I think the idea was to have the phone line personed, if you will, by someone who's in a position to do something about it rather than making another call. True. If they're there. If they're there. But if they're not there, it's not going to be very helpful. They have a phone call. Say you're giving somebody a 27-7, a 24-7 phone number, but in fact the person's not there. You know, they turn their phone off at night. It's not at all the same thing. That's not helpful. No, I'll agree. Let me try to understand. If somebody calls the hotline and they say, well, we don't have anybody available, it's your problem, would you agree that that is an issue of the free choice, that kind of answer? For that individual, it may be, Your Honor. But the question is on this record whether wholesale, categorically, whether systematically people were denied choice. All right. So you think it may be. You see, I understood your free choice theory to be that it isn't. Your free choice theory seems to be as long as you tell them what's available, i.e., bad service, that's good enough. That's what the only circuit case that's weighed in on this issue. Well, is that your position or not? I'm sorry? Is that your position? We're not conceding, Your Honor, that the district court cases that go there are necessarily implementing the free choice provision. If they're permitted to go there and if that's where the law is, we believe that the line was drawn too close to perfection here in light of what those other cases found as violations of free choice, which is really an illusory promise. It's not a choice at all. You're languishing on a waiting list for something that's not available in the all case. Well, you're telling somebody that they're going to get care when they need it and it's not available. That's different than excluding them or denying them. I guess it's a matter of degree. You talk about perfection. Well, where would you draw the line that 10 percent of the people can be denied service or 20 percent and it's not a problem? Happily, Your Honor, I'm not called upon to draw that line. I will say that the record is going to suggest in this later time frame that a half of 500 percent. Do you think we should be looking? Oh, go ahead. Finish first. Go ahead. Please finish. Statistically, at least, they're really small numbers. All right. But as far as I can tell again, why are we looking at the later time frame? What record are we looking at? Materials that were submitted apparently by the plaintiffs in connection invited Mr. Johnston to submit additional materials. I'm not sure that's relevant to the dispute that's before you because I think that relates to what Judge Carroll did with the earlier record. We've gotten into an extensive discussion about what's transpired since then. I'm not sure that's really anything. Well, you're the one who just brought up the record about what has transpired since then. Well, counsel was talking about all kinds of things that transpired after that. Do you agree that we should just dismiss that appeal because no one's argued it and no one's given us a record on it? Well, I think the appeal is from the order that made it clear from Judge Carroll. No, the order – I'm sorry about that, but it's not. The order is from the denial of both your motion to modify the injunction and their motion to modify the injunction. And it was just the first sentence or so of the order that clarified that it was a permanent injunction. And the rest of it was all about your motions. You wrote motions and you put in records and no one had briefed it to us. I think the purpose of all of that – Actually, the part about the permanent injunction was a different order. It's not the order to modify the injunction. So the order that you appealed, you're telling me you're not interested in. You both seem to be telling me you're not interested in. I will say it as best I can, Your Honor, from my understanding of the record. And that is there was this question about whether the lower court was going to continue to have jurisdiction to deal with these ongoing issues that keep coming up. And that's all. And you don't want us to determine whether or not he should have – assuming that everything else he did up to that point was right, should have vacated the injunction, you don't want us to get into that? I think that's a fair characterization of the State's position, yes. That's your position? I think that is.  Thank you very much. Thank you for hearing me. Thank you both sides. The case of Ball v. Rogers is submitted. Thank you very much. The registrator will be hooked up again very shortly. Okay. Judge, I'm going to disconnect now. I'll connect you in the roving room in about two minutes. Okay. Thank you. Thank you. Thank you. Okay. Thank you. Thank you.
judges: Trager, Fletcher B. , Berzon